# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| CHRISTINE RENEE INGRUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3157 |
| | ) | |
| KILOLO KIJAKAZI,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Christine Renee Ingrum appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) under Title II of the Social Security Act and her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Plaintiff Ingrum filed a Motion for Summary Judgment (d/e 17). Defendant Commissioner filed a Motion for Summary Affirmance (d/e 24). Plaintiff Ingrum filed a Reply to Commissioner's Memorandum in Support of Motion for Summary Judge (d/e 25). The parties consented to proceed

---

[1] The Court takes judicial notice that Kilolo Kijakazi has been appointed Acting Commissioner of Social Security.  She is automatically substituted in as the Defendant in this Case.  Fed. R. Civ. P. 25(d).

before this Court.  <u>Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered July 13, 2020 (d/e 8)</u>.  For the reasons set forth below, the Decision of the Commissioner is affirmed.

<u>BACKGROUND</u>

Ingrum was born on December 12, 1962.  She completed three years of college and secured an associate degree.  She previously worked as a registered nurse, a soda fountain salesclerk, waitress, and a salesclerk at a furniture store.  Ingrum protectively filed her claim for Disability Benefits on April 19, 2017.  She alleged that she became disabled on December 31, 2011.  She later amended her allegations to claim that she became disabled on January 20, 2015 (Onset Date).  Ingrum suffered from degenerative disc disease, history of cervical spine fusion, cubital tunnel syndrome, depression, and anxiety.  The last date that Ingrum was eligible for DIB was December 31, 2015 (Date Last Insured).  <u>Certified Transcript of Proceedings before the Social Security Administration (d/e 13) (R.)</u>, at 13-14, 23, 36, 71, 590.

## STATEMENT OF FACTS

### Evidence submitted before the Evidentiary Hearing

On April 15, 2009, Dr. Stephen Pineda, M.D., performed surgery on Ingrum's cervical spine.  Ingrum had abnormal discs at C4-5 and C5-6.  Dr. Pineda performed discectomies, cervical fusion, and the application of a fusion device and plate at C4-5 and C5-6.  R. 396-97.

On August 29, 2011, Ingrum saw mental health professional Kristina Wise, M.A., for a mental health assessment.  R. 558-559.  Ingrum reported medical issues due to her degenerative disc disease.  She took no pain medication as she had a significant opioid addiction in the past and lost her license to practice nursing due to the addiction.  She divorced a little more than a year earlier and lost contact with a stepdaughter.  She lived with a boyfriend who had an eight-year-old son with behavior issues and she had financial problems.  She reported difficulty sleeping; varying appetite; down mood; crying spells; loss of interest and enjoyment; poor focus, self-esteem, and memory; guilt; and feeling like giving up.  She denied any suicidal ideations.  Wise opined that Ingrum did not have bipolar, impairing anxiety, or personality disorder.  Ingrum also denied any psychosis.  R. 560.  Wise assessed major depressive disorder, moderate, recurrent and assigned a Global Assessment of Functioning (GAF) score of 50.  R. 559.

A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  American Psychiatric Association (APA), Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000) (DSM-IV-TR), at 34.  The APA stopped using GAF scores in 2013.  APA, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-5), at 16.

On October 27, 2011, Ingrum saw psychiatrist Dr. Santosh Shrestha, M.D.  R. 572-73.  Ingrum had taken medications for depression in the past, but stopped because she was doing well.  She reported that she did not have insurance and had financial difficulties at the time of the visit.  She reported over-the-counter Benadryl to help with sleep, and she was sleeping six to eight hours a night.  On examination, she was alert and oriented; she had fair eye contact; no psychomotor agitation or retardation; normal speech; depressed mood; dysphoric affect; linear thought process; no suicidal or homicidal ideations; no hallucinations or delusions; and her insight and judgment were fair.  R. 572.  Dr. Shrestha assessed major depression disorder, recurrent, moderate, with history of opiate dependence and assigned a GAF score of 50-55.  A GAF score of 51-60 indicated moderate symptoms or moderate difficulty in social, occupational,

or school functioning.  GSM-IV-TR, at 34.  Dr. Shrestha prescribed Prozac (fluoxetine) and discussed continuing her counseling/therapy.  R. 573.

On May 20, 2014, Ingrum saw Advanced Practice Nurse (APN) Rhonda J. Harms, APN-C, to establish care as a new patient.  R. 504-09.  Ingrum reported having fatigue that began two months earlier and was constant.  She had difficulty concentrating and her symptoms were worse with exertion, lack of sleep, stress, and work issues.  She denied any myalgia.  R. 504.  On examination, Ingrum had normal muscle strength, range of motion, and stability; she had no sensory loss and an intact memory; she was oriented and had an appropriate affect.  Ingrum was negative for anhedonia; was not anxious; behaved appropriately for her age; had normal fund of knowledge, language, insight, judgment, attention span, and concentration; was forgetful; did not have memory loss; had mood swings; and did not have pressured speech or suicidal ideations.  R. 508.  Harms ordered blood tests and prescribed Effexor XR 150 (venlafaxine).  R. 509.

On August 14, 2014, Ingrum saw APN Harms.  She reported improvement in her symptoms of anxiety and depression.  Ingrum reported a history of suicide attempts and difficulty sleeping and irritability associated anxiety and depression.  R. 494.  On examination, Ingrum had

normal range of motion, muscle strength, and stability; her memory was intact, and she had no sensory loss; she was oriented, had normal insight and judgment, and had an appropriate mood and affect.  She stated she did "OK" with just Effexor but had better outcomes in the past by adding the medication Abilify to the Effexor.  Harms renewed the Effexor prescription and planned to contact Ingrum's insurance to see if she could get coverage for Abilify in addition to the Effexor.  R. 497.

On January 20, 2015, Ingrum saw APN Harms for a gynecological examination. She also reported moderate neck pain and said she had pain daily in her neck, shoulders, and arms.  The pain increased with flexion and hyperextension of the neck, and with turning her head.  Nothing relieved the pain.  Ingrum said she was having more pain lately "and just wanted us to know."  R. 488.  On examination, she had intact memory and no sensory loss; she was anxious and had mood swings; she was negative for anhedonia; was not agitated; had normal knowledge, insight, judgment, attention span, and concentration; was not forgetful; and did not have memory loss, pressured speech, or suicidal ideations.  Her mood and affect were appropriate.  R. 492.  Harms did not examine Ingrum's back or neck. Ingrum was not ready to do anything about her neck.  She wanted to monitor the pain and would let Harms know if she had further problems.

Harms noted that she had prescribed Effexor and Abilify for Ingrum.  R. 492.

On March 31, 2015, Ingrum saw APN Harms for depression and fatigue.  She reported unstable symptoms and said functioning was very difficult.  She stated she had a depressed mood, difficulty concentrating, difficulty sleeping, diminished interest, excessive worry, fatigue, racing thoughts, and restlessness.  R. 483.  On examination, Ingrum had intact memory and no sensory loss; she was oriented, anxious, agitated, and had mood swings; she was negative for anhedonia[2]; had normal knowledge, language, insight, and judgment; and did not have memory loss, pressured speech, or suicidal ideations.  Her mood and affect were appropriate. Harms increased the Effexor dosage.  R. 486.

On June 29, 2015, Ingrum went to the emergency room.  She saw Dr. Pak Fung, M.D. and reported pain in her left arm that radiated from the wrist to the elbow.  The symptoms started a year earlier and she never knew when the pain would occur.  The pain was like an electric shock and the symptoms were worse in the past two weeks.  She reported some weakness in her grip.  She had no shoulder or neck pain.  She reported

---

[2] Anhedonia is a psychological condition characterized by inability to experience pleasure in normally pleasurable acts. Miriam Webster Dictionary, accessed January 31, 2022.

that the pain was severe.  R. 381.  On examination, Ingrum was alert; her neck had an easy range of motion with no tenderness; she had no swelling or tenderness in her left radial or ulnar area; she had limited range of motion in her wrist; she had normal extension and flexion of the left elbow with some discomfort.  R. 382-83.  Dr. Fung assessed cubital nerve syndrome.  He administered a Toradol injection and recommended securing a cubital tunnel syndrome splint; Dr. Fung did not have such a splint to provide to her.  R. 383.

On July 7, 2015, Ingrum saw orthopedic surgeon Dr. Brett Wolters, M.D., for her left elbow and wrist pain.  She reported that the pain was getting worse and sometimes caused nausea and vomiting.  She used a brace on her left hand and that helped somewhat.  On examination, she had pain with Spurling's test.[3]  She had no pain to palpation of her cervical spine; she had full range of motion in her shoulders without pain; she had full range of motion in her elbows; Tinel's sign at the wrist was positive bilaterally, but worse on the left.[4]  She had good strength in her finger abductors bilaterally.  Dr. Wolters assessed numbness in her hands and

---

[3] Spurling's test is a test for radiculopathy.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1900.
[4] Tinel's sign is tingling sensation at the distal end of a limb.  See Doland's, at 1716.

possible cubital tunnel syndrome bilaterally.  He recommended an EMG/nerve conduction study.  R. 370.

On August 17, 2015, Ingrum saw APN Harms.  She reported that her depression symptoms were "fairly controlled."  Her initial symptoms had improved, but she reported that functioning was "somewhat difficult."  She said she had a depressed mood but no difficulty falling asleep.  She had a fair response to the Effexor and denied having side effects from the medication.  She tried an increased dose of Effexor on her own and felt much better on the increased dose.  R. 478.  On examination, Ingrum was oriented, had appropriate mood and affect, and normal insight and judgment.  Ingrum denied suicidal thoughts or ideations.  Harms assessed that Ingrum's depression was controlled and prescribed the increased dose of Effexor.  R. 481-82.

On December 17, 2015, Ingrum saw nurse practitioner Ann Zahniser, FNP-C.  Zahniser was in the same office as APN Harms.  Ingrum reported left arm pain that had started a few days earlier.  She had no pain since, but her arm did not "feel right," and felt "disconnected."  She reported that her previous left wrist pain from July 2015 went away with bracing.  Ingrum reported that the arm did not hurt while she cleaned her carpets on the day of the examination but did hurt at the examination.  R. 474.  On

examination, she had an abnormal heart rate; her cervical spine was not tender and had moderately reduced range of motion; she had normal gait, thoracic spine, shoulders, elbows, and hands; she was oriented.  Zahniser ordered a stress test and EKG and advised Ingrum to chew an aspirin and go to the emergency room if the arm pain recurred.  R. 477.

On December 29, 2015, Ingrum saw APN Harms.  She reported uncontrolled symptoms of anxiety.  She had anxious/fearful thoughts, excessive worry, fatigue, and restlessness.  She denied thoughts of death or suicide and said functioning was very difficult.  Ingrum was very anxious and crying.  R. 471.  On examination, her appearance was anxious and tearful; she had increased activity and mood swings associated with anxiety; she was oriented; had no agitation or anhedonia; had appropriate mood and affect; sufficient knowledge and speech; no memory loss or obsessive thoughts; normal insight, judgment, attention span, and concentration; and no pressured speech or suicidal ideation.  R. 473. Harms assessed anxiety and prescribed Ativan temporarily to take as needed to get through a funeral of a friend.  R. 473.

On January 12, 2016, Ingrum saw Harms for headaches and neck pain.  The symptoms started four weeks before the visit and the pain was moderate and occurred randomly.  The pain went down her right arm and

she also reported mild to moderate pain in her left foot.  R. 466.  On examination, Ingrum's cervical spine was tender and her range of motion in her neck was mildly reduced; she had mild pain with motion in her left foot; she was oriented with appropriate mood and affect and normal insight and judgment.  Harms ordered an MRI of Ingrum's neck and x-rays of her cervical spine and left foot. Harms referred Ingrum to Dr. Pineda.  R. 469.

On January 13, 2016, x-rays of Ingrum's left foot showed normal alignment, no fracture, and moderate osteoarthritis of the left first metatarsal phalangeal joint.  R. 525.  X-rays of Ingrum's cervical spine showed a solid fusion from C4 to C6, progressive loss of disc height at C3-4 and moderate to severe facet joint arthropathy at C7-T1.  The radiologist assessed no complications with the fusion and mild degenerative changes involving the C3-4 and C6-7 disc spaces.  R. 524, 527.

On January 20, 2016, an MRI of Ingrum's cervical spine showed C4 through C6 fusion; disc osteophyte complex and uncovertabral spurring and mild canal and foraminal stenosis at C3-4; and mild disc osteophyte complex, uncovertebral spurring, facet hypertrophy and right-sided synovial cyst with mild to moderate canal, moderate left foraminal and mild right foraminal stenosis at C6-7.  R. 522.

On February 9, 2016, Ingrum saw Dr. Pineda.  She reported headaches and pain in her neck and right arm.  Dr. Pineda said the MRI showed degenerative changes at C3-C4 and C6-C7 and thought that the changes at C3-4 may be the source of her pain.  On examination, Ingrum was alert; she could move her head around; certain movements aggravated her symptoms; she had intact sensation; she could fire her arm, hand, and finger muscles.  Dr. Pineda ordered more x-rays and an EMG/nerve conduction study.  R. 369.  X-rays showed post-operative changes at C4-C6 with stable hardware, narrowing of the C3-4 interspace. R. 359.

On February 16, 2016, neurologist Dr. David Gelber, M.D., performed an EMG/nerve conduction study of Ingrum's upper extremities.  Ingrum had a normal study with no evidence of chronic cervical radiculopathy, peripheral neuropathy, or upper extremity nerve entrapments.  R. 421.

On February 22, 2016, Ingrum saw Dr. Pineda.  Dr. Pineda declined to perform surgery because the EMG/nerve conduction study was unremarkable.  Dr. Pineda told Ingrum to work with her primary care provider for medications to treat her condition and refilled a prescription for Norco (hydrocodone/acetaminophen) but told her to have her primary care provider refill prescriptions in the future.  R. 365.

On March 10, 2016, Ingrum saw APN Harms for neck pain.  She reported being in quite a bit of pain.  The pain symptoms were aggravated with bending, hyperextension of the neck, lifting, prolonged sitting, and turning her head.  She said nothing relieved the pain and asked to be referred for a second opinion.  R. 462.  On examination, her cervical spine was tender and neck motion cause moderate pain; her sensory exam was normal; she was oriented, had appropriate mood and affect, and had normal insight and judgment.  R. 464.  Harms prescribed tramadol (Ultram) for her pain and referred her for a second opinion.  R. 464.

On May 18, 2016, Ingrum saw pain specialist Dr. Ferdinand Salvacion, M.D.  She reported pain in her neck radiating into her shoulders. She had the pain since November 2015 and it was worsening over time. The pain was better with changing positions and worse when driving, looking up or down, and lifting.  R. 407.  On examination, her cervical range of motion was full.  She had some spasming in the cervical paraspinal musculature and trapezius muscles bilaterally.  Her motor and sensory was intact in her upper extremities.  Dr. Salvacion assessed status post cervical fusion, cervical spondylosis.  Ingrum was scheduled to begin physical therapy soon and Dr. Salvacion prescribed a supplement and a few hydrocodone.  He told her to return if her symptoms were still bothersome

after the therapy, and they would consider epidural steroid injections at that time.  R. 408.

On January 10, 2017, Ingrum saw APN Harms for neck pain.  Harms noted that Ingrum saw several specialists who told her she was not a candidate for surgery because she did not have any permanent nerve damage.  Ingrum wanted an increase in her pain medication.  R. 458.  On examination, she had decreased range of motion in her cervical spine with pain and she had a difficult time with forward flexion and looking down.  R. 458.  Harms ordered more x-rays and declined to increase the dosage of her pain medications.  She referred Ingrum back to Dr. Salvacion.  R. 459. X-rays on February 13, 2017 showed cervical fusion C4-C6 intact, narrowing of the C3-4 interspace with moderate spurring and moderate arthropathy.  The radiologist concluded, "Nothing acute."  R. 515.

On March 28, 2017, Ingrum had an MRI of her cervical spine.  The radiologist assessed no significant degenerative progression, C4-C6 fusion, mild canal and foraminal stenosis at C3-4, and mild to moderate canal and at least mild right asymmetric foraminal stenosis at C6-7.  R. 514.

On April 10, 2017, Ingrum saw Dr. Pineda.  She reported neck pain. Dr. Pineda reviewed the MRI and found, "No major problem on it that would explain" the neck pain.  Ingrum also reported some low back pain.  On

examination, she was awake and alert; she stood and walked; she could fire the muscles in her lower extremities; she had intact sensation.  Dr. Pineda recommended medication management for her symptoms and referred her to the pain center because he did not provide long-term pain management.  R. 417.

On April 13, 2017, Ingrum saw APN Harms.  Her neck pain was moderate but worsening.  Turning her head right or left exacerbated the pain.  Rest relieved the symptoms, but she also had a headache.  She reported anxiety symptoms of excessive worry, fatigue, insomnia, and irritability and said her anti-anxiety and anti-depression medications provided fair symptom control.  She could do housework with limitations.  R. 456.  On examination, Ingrum had minimal range of motion in her neck; she ambulated without difficulty; she had normal speech, language, thought content, fund of knowledge, attention span, and concentration; she could perform basic computations and apply abstract reasoning; she could recall recent and remote events.  Ingrum did not have any suicidal thoughts or ideations.  Harms prescribed a Medrol (methylprednisolone) Dosepak, a corticosteroid, for her neck pain and told Ingrum she would not renew the tramadol prescription because of her anxiety symptoms.  Harms

recommended that Ingrum see her psychiatrist to adjust her anxiety medications.  R. 457.

On April 27, 2017, Ingrum saw Dr. Salvacion who administered a cervical epidural steroid injection.  She tolerated the injection well.  R. 545.

On May 14, 2017, Ingrum completed a Function Report-Adult form. R. 273-80.  Ingrum said she could not work due to constant headaches and constant bilateral neck, shoulder, and arm pain.  She occasionally had numbness, tingling, and swelling in her arms and hands.  She also had lumbar back pain and pain and swelling in both feet.  Ingrum said she needed to change positions constantly and also needed to raise her legs and feet above her heart.  She had increased pain while stretching her arms out, looking down, or tilting her head.  Reading, writing, and typing increased her headaches and pain in her neck, arms, and shoulders. Using her hands repetitively increased her hand pain and induced numbness.  Sitting with her feet down increased pain and swelling in her feet.  Changing positions temporarily relieved the pain for five minutes or less.  R. 273, 280.

Ingrum said that she lived alone in a rented room.  In a typical day, she got up, ate breakfast, took her pain medication, and lay down.  She showered if she was able.  She watched television and took short walks in

her yard and took naps occasionally.  She slept poorly due to the pain and woke up at night when she rolled over in bed or lifted her head off the pillow.  Ingrum experienced pain performing her personal care.  She needed encouragement from friends and family to take care of herself and also needed reminders to take her medications. R. 273-75.

Ingrum prepared meals daily.  She prepared sandwiches, frozen dinners, and other simple meals.  She did light cleaning in her room and did laundry in small, lighter loads.  She took frequent breaks when she performed chores and needed encouragement to perform chores.  She did not perform any outdoor chores.  R. 275.

Ingrum drove and went out alone.  She shopped for groceries and personal items; shopping trips took 10 to 40 minutes.  She could pay bills, count change, and handle a checking account.  In addition to watching television, Ingrum sometimes engaged in sewing, quilting, jewelry making, and reading; however, she usually could not do these activities due to pain. She occasionally visited with friends and family.  She did not go anywhere on a regular basis.  R. 275-77.

Ingrum opined that her impairments limited her ability to lift, squat, bend, stand, reach, sit, kneel, climb stairs, remember, complete tasks, concentrate, and use her hands.  Lifting a gallon of milk caused sharp pain.

She could walk 25 yards without stopping and needed to rest for 10

minutes thereafter.  She could pay attention 20 to 30 minutes.  She could

follow written instructions, and she could follow spoken instructions unless

her pain level was high.  High pain decreased her concentration.  She got

along with authority figures, but could not handle stress.  She could handle

changes in routine.  She wore wrist splints.  R. 278-79.

On May 14, 2017, Ingrum filled out and signed a Work History

Report.  R. 269.  In that report, she indicated she had been a furniture store

employee.  R. 262.  She stated she sold furniture, cleaned the store, and

re-arranged furniture display groupings.  She scooted, pulled, and dragged

sofas, chairs, dressers, and tables.  She said the heaviest weight lifted was

100 pounds and she frequently lifted 25 pounds and 50 pounds or more.

She also indicated she walked or stood six to seven hours a day.  R. 264.

On June 1, 2017, Ingrum saw psychiatrist Dr. Shrestha to reestablish

care.  She reported that her symptoms got better since she saw Dr.

Shrestha before, but her symptoms worsened over the last two years.  She

reported passive death wishes but no suicidal thoughts and she denied

attempting suicide in the past.  She had a lack of motivation and interest.

She reported psychomotor retardation and that her symptoms were worse

in the morning.  She also had continuing neck pain, problems sleeping, and

anxiety symptoms.  She denied having any hallucinations, paranoia, or delusions.  Ingrum reported she tried cocaine and marijuana in her early 20's but had no history of regular drug use.  R. 606.

On examination, Ingrum's mood was sad, and her affect was congruent.  She had normal speech, logical and goal directed thought, and intact insight and judgment.  Dr. Shrestha assessed major depressive disorder, severe, recurrent, without psychosis.  Dr. Shrestha noted that Ingrum had a history of opiate dependence and added Latuda (lurasidone HCI) to Ingrum's prescription for Effexor.  Dr. Shrestha prescribed Latuda instead of Abilify because Ingrum's insurance would not cover Abilify.  He also recommended psychotherapy, increased socialization, and exercise. R. 606-08.

On June 10, 2017, Ingrum saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  She reported constant headaches; she could not rest her upper extremities on a countertop and driving caused pain; she reported pain in her fingertips.  She also had pain in her lower back and rated her pain at 4-5/10.  R. 590.  On examination, Ingrum was alert, oriented, and in no acute distress; she could bear weight and ambulate without aids; she had a normal neurological exam; she had no swelling, redness, or heat in her joints; her reflexes were symmetric and

there was no evidence of muscle spasms; she had 5/5 grip strength

bilaterally; she could perform fine and gross manipulations; she had normal

lumbosacral flexion; she had full range of motion in all her joints except her

cervical spine; straight leg testing was negative.  Dr. Chapa assessed

status post cervical fusion and found no evidence of cervical radiculopathy;

she had normal strength and a normal sensory examination.  R. 591-92.

On July 11, 2017, Ingrum saw Dr. Salvacion who administered a

cervical epidural steroid injection.  She tolerated the injection well.  Dr.

Salvacion listed Ingrum's diagnosis as cervical spondylosis, cervical

radiculopathy, and cervical stenosis.  R. 596.  Ingrum asked if Dr.

Salvacion would prescribe tramadol to her.  She reported that her current

provider limited her to four pills a day, and she believed that was not

enough.  Dr. Salvacion said he required a urine drug screen test first.

Ingrum admitted regular marijuana use and Dr. Salvacion refused to

prescribe tramadol for her due to her regular marijuana use.  R. 596.

On July 24, 2017, state agency psychologist Dr. Howard Tin, Psy.D.,

prepared a Psychiatric Review Technique assessment of Ingrum.  Dr. Tin

opined that Ingrum had unspecified depression and anxiety related mental

impairments.  He opined that Ingrum's mental impairments were non-

severe.  R. 63-64.

On August 2, 2017, state agency physician Dr. Julio Pardo, M.D., prepared a Physical Residual Functional Capacity Assessment form.  R. 65-68.  Dr. Pardo opined that Ingrum could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in eight-hour workday; sit for about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, and scaffolds; and avoid concentrated exposure to hazards.  R. 66-67.

On September 10, 2017, Ingrum completed another Function Report-Adult form.  R. 300-07.  Ingrum said she could not work due to degenerative disc disease.  She could not lift or stand for prolonged periods due to lumbar pain and she had constant cervical, neck, shoulder, and arm pain with daily headaches.  Her pain increased with minimal activity; she had sharp pain when looking down; her pain increased with arms extended in front or resting on flat surfaces such as tables and counter tops; her pain woke her up frequently at night; she woke up when she lifted her head at night to roll over; her pain increased her depression. R. 300, 301, 307.

Ingrum said that she spent her time watching television, eating light meals, and "maybe" sitting outside.  She lived alone in a rented room and she could dress, shower, feed herself, and use the toilet.  She had difficulty

combing her hair due to pain when she lifted her arms and she had pain looking down to shave her legs.  She needed encouragement to take care of herself and to take her medications.  R. 300-02.

Ingrum prepared meals daily.  She prepared sandwiches, frozen dinners, and simple meals.  She did "minimal" dusting and laundry.  She did "a little" of these chores and then rested.  Sometimes, she took all day to do chores and she needed encouragement and someone to carry her laundry and to vacuum for her.  She did not do yardwork.  R. 302-03.

Ingrum got out a couple times a week.  She drove and went outside alone.  She shopped for groceries and went shopping every couple of weeks.  She could pay bills, count change, and use a checking account.  R. 303.  Due to her pain, she only rarely engaged in sewing, quilting, jewelry making, and reading.  She mainly watched television.  She visited with people on a monthly basis and seldom went out due to her constant pain and depression.  R. 304.

Ingrum opined that her impairments limited her ability to lift, sit, squat, bend, stand, reach, sit, climb stairs, remember, complete tasks, concentrate, and use her hands.  She experienced sharp pain lifting a gallon of milk.  She could follow written instructions at her own pace due to pain.  She could follow spoken instructions if she had plenty of time and if

the instructions were repeated occasionally.  She could not handle stress, and she could handle changes in routine.  R. 305-06.

On October 6, 2017, Ingrum saw neurologist Dr. Koteswara Narla, M.D.   She reported cervical pain that radiated into her head.  Ingrum said the epidural steroid injections did not provide much relief and the tramadol did not help much.  Dr. Narla would not recommend opioids due to her symptomatology.  On examination, Ingrum was alert, oriented, and not in acute discomfort; she had normal motor power and normal reflexes; her neck was stiff; she had normal sensation and coordination; she could walk. R. 616. Dr. Narla recommended physical therapy and continued use of tramadol.  He noted that Dr. Pineda could not recommend additional surgery because of her MRI results.  R. 615.

On October 16, 2017, Ingrum saw APN Harms for left elbow pain. The pain came on suddenly two months earlier and was moderate and worsening.  Movement aggravated the pain.  R. 628.  Ingrum also reported continuing neck pain.  R. 629.  On examination, Ingrum was alert and in no acute distress; she ambulated without difficulty; she had good range of motion in the area of the olecranon end of her ulna bone in her elbow; she had good strength.  R. 628.  Harms ordered an x-ray of the left elbow and blood tests for possible referral to rheumatology.  R. 630.

On October 18, 2017, x-rays of her left elbow were unremarkable with no fracture, no significant degenerative changes, and no evidence of joint effusion.  R. 631.

On October 30, 2017, Ingrum saw physical therapist Laura Starr PT for an initial evaluation.  Ingrum presented with constant neck, shoulder, left elbow pain, and headaches.  She also complained of low back pain that radiated into her left leg.  The problem was getting worse over the last two to three years.  She told Starr that her MRIs showed bony changes in her cervical spine with small cysts and two ruptured discs in her lumbar spine.  Ice, heat, and epidural steroid shots did not help.  Changing positions helped temporarily.  R. 645.  On examination, Ingrum's gait was unremarkable except she had a reduced right arm swing; she had reduced range of motion in her neck.  Ingrum's cervical muscles had -4/5 or 4/5 strength.  She had limited mobility of her neck with pain; she had no numbness or tingling; she was tender in her cervical musculature and upper trapezius muscles.  R. 646-47.  Star recommended therapy two to three times a week for six weeks.  R. 647.

On November 7, 2017, Ingrum saw physical therapist assistant Tammy Frankford, PTA, for physical therapy.  Ingrum said she did not feel different after the first session, but the cervical work during the session felt

good.  She also said she had frequent headaches and left elbow pain.  R. 641.  Ingrum tolerated the therapy session well.  She had palpable stiffness in her upper trapezius muscles.  R. 641.

On November 8, 2017, state agency psychologist Dr. Donald Henson, Ph.D., prepared a Psychiatric Review Technique assessment of Ingrum.  Dr. Henson opined that Ingram had unspecified depression and anxiety related mental impairments.  He opined that her mental impairments were non-severe.  R. 100-01.

On November 13, 2017, state agency Dr. Lenore Gonzalez, M.D., prepared a Residual Functional Assessment of Ingrum.  Dr. Gonzalez opined that Ingrum could lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to vibration and hazards.  R. 104-05.

On November 14, 2017, Ingrum saw physical therapist assistant Tammy Frankford, PTA, for physical therapy.  Ingrum had a headache from driving.  She said she was about the same with increased left arm and elbow pain.  Her headache was better after the session.  R. 643.

On November 30, 2017, Ingrum saw a mental health professional at Dr. Shrestha's office.  The provider is unidentified because the notes are handwritten, and the provider's initials are not legible.  Ingrum had problems sleeping, and she reported passive suicidal ideations.  She had no delusions, hallucinations, or paranoia.  She was oriented and her insight was fair.  Her medications were adjusted.  The provider added Remeron. R. 675.

On January 10, 2018, Ingrum saw APN Harms.  She reported low back pain.  The pain started six months earlier and was constant, moderate, and worsening.  The pain was exacerbated by prolonged standing, lifting, bending, and straining.  Rest relieved the pain which radiated down her left leg and she felt weakness in her left leg.  She also reported numbness in her left leg.  R. 690.  On examination, Ingrum was alert; she ambulated without difficulty; she had good range of motion in her hips and straight leg testing was negative.  Harms ordered x-rays of her lumbar spine.  On January 22, 2018, x-rays of the lumbar spine showed: "Nothing acute.  Multilevel degenerative disc disease.  Moderate facet arthropathy."  R. 677.

On March 14, 2018, Ingrum saw a mental health professional at Dr. Shrestha's office.  She had problems with side effects from the Latuda and

stopped taking it.  She did not take the Remeron because she was afraid of side effects.  Her mood was improving and her sleep and appetite were unremarkable.  On examination, she was oriented, and her insight was fair. She had no suicidal ideations, homicidal ideations, delusions, hallucinations, or paranoia.  Ingrum was assessed with major depressive disorder without psychosis and acute dystonia.[5]  The Latuda prescription was reduced in dose and Cogentin was prescribed for the dystonia.  R. 674.

On August 28, 2018, x-rays of the cervical spine showed anatomic alignment, vertebral bodies at normal height, facet arthropathy at C6-7 and C7-T1, disc height well maintained, and intact fusion of C4-6 without evidence of hardware loosening.  R. 679.

On October 26, 2018, Ingrum saw APN Harms for low back pain that radiated into her left hip and leg.  Ingrum reported feeling like bugs were crawling on her left leg.  On examination, she had normal gait and station; she had pain in her lumbar spine with motion and tenderness; straight leg raising tests were negative; she was alert and had a normal neurological exam; she had a normal psychiatric exam with normal attention span and concentration.  Harms ordered a lumbar spine x-ray.  R. 712, 719-20.

---

[5] Dystonia is an involuntary movement disorder.  See Dorland's, at 582.

On November 12, 2018, x-rays of Ingrum's lumbar spine showed a stable lumbar spine with space narrowing at L5-S1 and L2-3 with hypertrophic endplate spurring, and no new or acute abnormality.  R. 681.

On December 19, 2018, Ingrum saw APN Harms for lumbar spine pain.  Ingrum had completed another round of physical therapy and wanted an MRI of her lumbar spine.  R. 722.  On examination, Ingrum had pain with motion of her lumbar spine with tenderness and swelling.  Her gait and station were normal.  Her psychiatric exam was normal with normal attention span and concentration.  Harms ordered an MRI of Ingrum's lumbar spine.  R. 729-31.

On January 10, 2019, Ingrum had an MRI of her lumbar spine.  The MRI showed multilevel degenerative changes most pronounced in the lower lumbar levels where there was mild spinal canal stenosis and up to moderate to severe neural foraminal stenosis.  R. 739.

On March 19, 2019, Ingrum saw APN Harms.  She reported continuing neck, shoulder, and lumbar pain and said she had to lie down several times a day to help with the pain.  She had difficulty carrying heavy objects and said that a gallon of milk was hard to carry.  R. 746.  On examination, Ingrum was negative for difficulties with fine and gross motor skills; she had normal posture and normal speech; she had normal gait and

station; she had pain with moving her neck and shoulders, and her shoulders and spine were tender; she had normal attention span and concentration; her psychiatric exam was negative; her mood was cheerful. R. 754-55.

The Evidentiary Hearing

On April 8, 2019, an Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 30-58.  Ingrum appeared in person and by her attorney.  Vocational expert Terri Crawford also appeared.  R. 32.

Ingrum testified first.  Her neck was stiff in 2015 and before.  Her 2009 surgery helped for a few years, but by 2015, the neck pain was constant.  The pain traveled down into her shoulders and down her left arm.  She said that "on my right side, it kind of feels like I got an ax, the metal part, sticking right here all the time."  R. 40.  She had headaches every day in 2015.  R. 40-41.

Ingrum testified that her neck was worse at the 2019 hearing than in 2015.  She also had constant headaches at the hearing and the intensity varied during the day.  R. 41.

Ingrum said she had lumbar pain.  She had the pain when she practiced nursing, but the pain was worse now.  She testified that she had

four ruptured discs in her lumbar spine.  She had pain daily that traveled down her left side into her left leg.  R. 41.

Ingrum said a gallon of milk was heavy, but she could carry it in the house from the refrigerator to the table.  R. 42.  Her neck problems limited her ability to walk and stand.  She could stand for 10 minutes and could walk for 10 minutes at a time.  She could sit for 15 minutes.  She needed to lie down four or five times a day due to her pain.  R. 43-44.  Ingrum's pain affected her left arm more than her right.  She also experienced numbness in her arm sometimes.  Ingrum said her condition was the same back in 2015.  R. 45.  Her condition interfered with her ability to bathe and shower as she had difficulty getting in and out of the tub, and she had difficulty using her hands over her head.  She initially said she could not do typical cleaning, housework, or yardwork. She later said that she could do a light chore for about 10 minutes if she could stand in one place.  R. 47-49.

Ingrum testified that she had decreased grip strength in her left hand and her problems with her left hand interfered with her ability to do craft projects.  R. 50.

The ALJ asked Ingrum about her depression.  Ingrum said that her depression affected her memory in 2015.  She needed to write things down

to remember them.  Depression also affected her concentration.  She could

concentrate for 15 minutes due to her pain.  R. 46.

Vocational expert Crawford testified.  Ingrum's counsel stipulated to

Crawford's qualifications to provide expert testimony.  Crawford classified

Ingrum's prior work selling furniture as light work.[6]  R. 53.  The ALJ posed

the following hypothetical question to Crawford:

> Ms. Crawford, for hypothetical #1, assume please the
> hypothetical person is of the same age, education, language
> and work background as the Claimant. Further assume if there
> is work the hypothetical person could do, it would be subject to
> the following conditions and limitations. . ..  Here, the
> hypothetical person could lift, carry, push, pull up to 20, 2-0
> pounds occasionally, 10 pounds frequently.  The hypothetical
> person could stand and or walk up to six hours total in the
> eight-hour workday.  Could sit for up to six hours total in the
> eight-hour workday.  This hypothetical person could
> occasionally climb ramps and stairs.  Could never climb
> ladders, ropers, or scaffolds.  This hypothetical person could
> occasionally balance, stoop, kneel, crouch, and crawl.  And the
> hypothetical person should have no more than occasional
> exposure to unprotected heights, dangerous machinery, or
> vibrations.  Just given those restrictions, would this hypothetical
> person be capable of performing any of Claimant's past work?

R. 54-55.  Crawford opined that the person could perform the furniture

salesclerk job as described in the Department of Labor's Dictionary of

Occupational Titles (DOT), but not as Ingrum performed the job.  R. 55.

---

[6] Light work involves lifting 20 pounds at a time and 10 pounds frequently and can require standing or
walking six hours in an eight-hour workday.  20 CFR § 404.1567(b), Social Security Ruling (SSR) 83-10.
1983 WL 31251 at *6

The ALJ then modified the hypothetical question to include

restrictions due to mental impairments:

> Thank you. Ms. Crawford, for Hypothetical #2, if I retain the limitations from Hypothetical 1, but if I add some mental restrictions such that one could understand, remember, and carryout at least simple tasks and instructions, if the hypothetical person could sustain concentration, attention, and persistence sufficient for those simple tasks and instructions, if this hypothetical person could interact adequately with supervisors, occasionally with coworkers, and never with the general public, and if the hypothetical person could respond appropriately to routine  workplace changes, with these additional restriction (sic), would the hypothetical person first of all have been capable of performing any past work?

R. 55-56.  Crawford said the hypothetical person could not perform

Ingrum's past relevant work.  R. 56.  The hearing concluded.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued his decision on June 17, 2019.  R. 13-24.  The ALJ

followed the five-step analysis set forth in Social Security Administration

Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires

that the claimant not be currently engaged in substantial gainful activity.  20

C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to

have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true,

Step 3 requires a determination of whether the claimant is so severely

impaired that she is disabled regardless of her age, education, and work

experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this

requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Ingrum met her burden at Steps 1 and 2.  She had not engaged in substantial gainful activity since the Onset Date.  She

suffered from the severe impairments of degenerative disc disease, history

of cervical spine fusion with intermittent complaints post-surgery.  R. 15-16.

The ALJ found that Ingrum's mental impairments were non-severe.  The

ALJ relied on examination notes that found normal mood, affect, memory,

insight, judgment, concentration, cognitive function, and eye contact; and

the opinions of state agency psychologists Drs. Tin and Henson.  R. 16-17.

At Step 3, the ALJ found that Ingrum's impairments or combination of

impairments did not meet or equal a Listing. R. 18.

> The ALJ then determined that Ingrum had the following RFC:
>
> After careful consideration of the entire record, I find that the
> claimant has the residual functional capacity to perform light
> work as defined in 20 CFR 404.1567(b) and 416.967(b) except
> occasionally climb ramps and stairs, never climb ladders,
> ropes, or scaffolds. She can occasionally balance, stoop, kneel,
> crouch, and crawl. She can have no more than occasional
> exposure to heights, machinery, and vibration.

R. 18.  The ALJ relied on February 2016 imaging that showed the 2009

fusion and hardware were stable; the normal results of the February 2016

EMG study; the March 2017 MRI; examinations that showed full range of

motion; Dr. Chapa's examination that showed normal results except for

reduced range of motion in the cervical spine, and no evidence of cervical

radiculopathy; the lack of any evidence of nerve root compression in the

2018 imaging of Ingrum's lumbar spine; mild spinal canal stenosis and

possible moderately severe neural foraminal stenosis in the January 2019 lumbar imaging; examinations that showed a normal gait; the lack of muscle atrophy, neurological deficits, or other signs of nerve root impingement (such as heat redness, or swelling); examination notes showing the ability to perform fine and gross manipulations; the opinions of Drs. Pardo and Gonzalez; and the lack of any contrary medical opinions. R. 20-21.

The ALJ discounted the GAF scores from the mental health professionals because GAF scores "have a subjective component and vary between different mental healthcare providers which lowers the reliability of the evidence."  The ALJ also noted that the APA no longer recommended the use of GAF scores.  The ALJ concluded that the GAF scores were not persuasive.  R. 22.

The ALJ discounted Ingrum's statements about the severity of her symptoms because they were inconsistent with the medical evidence including the imaging that did not show severe impairments and the examination notes that showed normal gait, normal range of motion in the extremities, and normal ability to engage in fine and gross manipulations; and the record that showed "conservative medication and treatment and no more than mild/minimal clinical findings."  R. 20.

At Step 4, the ALJ found that Ingrum could perform her past relevant work as a furniture salesclerk.  The ALJ relied on Crawford's testimony that the person in the ALJ's hypothetical question could perform the furniture salesclerk job as described in the DOT but not as Ingrum had performed the job.  The ALJ concluded at Step 4 that Ingrum was not disabled.  R. 23.

Ingrum appealed the ALJ's decision administratively.  On May 18, 2020, the Appeals Council denied Ingrum's request for review.  The ALJ's decision then became the final decision of the Defendant Acting Commissioner.  Ingrum then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.  Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social

Security Administration no longer uses the term credibility in the evaluation

of statements regarding symptoms).  The ALJ must articulate at least

minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

The ALJ's decision was supported by substantial evidence.  The

decision that Ingrum's mental impairments were non-severe was supported

by the opinions of Drs. Tin and Henson, and by the numerous mental

status examinations that found intact memory; normal concentration,

insight, judgment, thought content, speech, eye contact, and other

indicators of normal cognitive function.  The RFC finding was supported by

the imaging and EMG study that found a stable cervical fusion, no

radiculopathy, mild degenerative changes in Ingrum's cervical spine, and

mild to moderate degenerative changes in her lumbar spine[7]; numerous

---

[7] The imaging of her lumbar spine was in 2018 and 2019, long after her Date Last Insured.  As such, they would only be relevant for her SSI application.  See 42 U.S.C.§ 416(i); 20 C.F.R. § 416.335; Eichstadt v. Astrue, 534 F.3d 663, 665 (7th Cir. 2008); Perkins v. Chater, 107 F.3d 1290, 1295 (7th Cir. 1997).

examination notes that found normal gait, negative straight leg raising tests, normal range of motion in her extremities, and normal ability to perform fine and gross manipulations; Dr. Chapa's examination that was largely normal with normal range of motion and grip strength; and the opinions of Drs. Pardo and Gonzalez.  The ALJ's decision to discount the GAF scores was supported by the fact that the APA no longer recommends use of GAF scores, "It was recommended that the GAF be dropped from the DSM-5, for several reasons, including its conceptual lack of clarity. . . and questionable psychometrics in routine practice."  DSM-5, at 16.

Ingrum argues that the ALJ failed to build a logical bridge from the evidence to his conclusion because the ALJ described Ingrum's treatment as conservative.  The Court disagrees.  Ingrum had a cervical fusion surgery, but that was more than five years before the Onset Date.  Her treatment on or about the Onset Date and thereafter consisted of oral antidepressant and analgesic pain medication, two sets of physical therapy, and two epidural steroid injections.  The ALJ could reasonably characterize her treatment as conservative.  She had numerous imaging studies, one EMG study, and many medical appointments.  The treatment, however, remained largely unchanged.  The ALJ's characterization of her treatment was supported by substantial evidence.

Ingrum also argues that the ALJ erred in finding that she could perform her past relevant work as a furniture salesclerk.  The Court disagrees.  At Step 4, the claimant must show that she could not do her past relevant work either as she actually performed it or as the job was generally performed in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560(b); SSR 82-61.  The DOT indicated that the furniture salesclerk jobs was performed at the light exertional level.  DOT #270.357-030.  Crawford opined that the person in the ALJ's hypothetical question with the same age, education, experience, and RFC as Ingrum could perform the furniture salesclerk job as generally performed in the national economy per the DOT, but not as Ingrum had actually performed the prior furniture employee work.  Ingrum performed her previous work at a medium or higher exertional level as disclosed by her Work History Report.  R. 264.  The DOT and the opinion of the vocational expert Crawford supported the ALJ's determination at Step 4.

Ingrum relies on Lawson v. Colvin, 2015 WL 5334374, at *6 (S.D. Ind. September 14, 2015).  In Lawson, the Southern District of Indiana observed that the ALJ found that the claimant could perform his past relevant work as he actually performed the job but not as it was generally performed in the national economy.  The Southern District noted that the

claimant testified that he was fired because he could not keep up with the production demands of the job; thus, he could not perform the job either as he actually performed it or as it was generally performed in the national economy.  Lawson, 2015 WL 5334374, at *6.  Here, the DOT and Crawford's opinion provided evidence that Ingrum could perform the furniture salesclerk job as it was generally performed in the national economy.  The Lawson dicta, therefore, does not apply.

Ingrum further argues that the ALJ erred because Crawford testified that she could not perform her past relevant work if the ALJ added limitations to the RFC that limited the hypothetical person to simple tasks and instructions, occasional contact with co-workers, and no contact with the public.  The ALJ did not find that these additional limitations were part of Ingrum's RFC.  The RFC determination was supported by substantial evidence as discussed above.  The ALJ, therefore, did not err in relying on Crawford's relevant opinions.

THEREFORE, IT IS ORDERED that Defendant Commissioner's Motion for Summary Affirmance (d/e 24) is ALLOWED, Plaintiff Christine Renee Ingrum's Motion for Summary Judgment (d/e 17) is DENIED, and the decision of the Defendant Acting Commissioner is AFFIRMED.

THIS CASE IS CLOSED.

ENTER:   February 8, 2022

_____ s/ *Tom Schanzle-Haskins* _____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE